## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RINA ROLLHAUS, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>    v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, JOHN F. GAVIN, FRANCIS J. MURPHY, ERIC A. SWANSON, PETER Y. CHUNG, BENNY P. MIKKELSEN, STAN J. REISS, JOHN RITCHIE, VINCENT T. ROCHE, MATRIX PARTNERS VIII, L.P., SUMMIT PARTNERS VENTURE CAPITAL FUND III-A, L.P., SUMMIT PARTNERS VENTURE CAPITAL FUND III-B, L.P., SUMMIT INVESTORS I, LLC, SUMMIT INVESTORS I (UK), L.P., COMMONWEALTH CAPITAL VENTURES IV L.P., THE MALINI SHANMUGARAJ 2016 QTIP TRUST, MEHRDAD GIVEHCHI, GIVEHCHI LLC, JOHN LOMEDICO, BHUPENDRA C. SHAH, BHUPENDRA SHAH 1999 TRUST U/A DTD 10/06/1999, CHRISTIAN RASMUSSEN, OFS FITEL, LLC, EGAN MANAGED CAPITAL III, L.P., WESTON & CO. VIII, LLC, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY & CO. LLC, NEEDHAM & COMPANY, LLC, COWEN AND COMPANY, LLC, WILLIAM BLAIR & COMPANY, L.L.C. and NORTHLAND SECURITIES, INC.,<br><br>           Defendants. | Civil Action No.<br><br>**Class Action Complaint For Violation of the Securities Act of 1933**<br><br>Jury Trial Demanded |

Plaintiff Rina Rollhaus ("Plaintiff"), individually and on behalf of all others similarly situated, by her undersigned counsel, alleges the following upon personal knowledge as to

herself and her own acts and upon information and belief as to all other matters. Plaintiff's information and belief as to matters other than her own acts are based on: the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Acacia Communications, Inc. ("Acacia" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, and press releases and other public statements issued by and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased Acacia common stock pursuant to or traceable to a secondary public offering on or about October 7, 2016 (the "Secondary Offering"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the 1933 Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

4.      Venue is proper in this District pursuant to Section 22 of the 1933 Act and 28 U.S.C. §1391(b) and (c). The acts and practices complained of herein occurred in substantial part in this District and Acacia is headquartered in this District.

5.      In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

6.    Plaintiff Rina Rollhaus purchased Acacia common stock in the Secondary Offering on October 7, 2016 at the price of $100.00 per share, as set forth in the accompanying certification, which is incorporated herein by reference, and has been damaged thereby.

7.    Defendant Acacia designs, develops, manufactures and markets high-speed coherent optical interconnect products for cloud infrastructure operators and content and communication service providers.    Acacia is headquartered at Three Mill and Main Place, Suite 400, Maynard, Massachusetts.    Acacia common stock traded in an efficient market on the Nasdaq Global Select Market under the ticker symbol "ACIA."  In connection with the Secondary Offering, 4,500,000 shares of Acacia common stock were sold.  Acacia is strictly liable for the materially false and misleading statements and/or omissions in the Offering Documents (defined below).

8.    Defendant Murugesan Shanmugaraj ("Shanmugaraj") is, and was at all relevant times, Acacia's President, Chief Executive Officer ("CEO") and a member of its Board of Directors.  He signed or authorized the signing of the Registration Statement, as defined below.

9.    Defendant John F. Gavin ("Gavin") is, and was at all relevant times, Acacia's Chief Financial Officer ("CFO").  He signed or authorized the signing of the Registration Statement.

10.    Defendant Francis J. Murphy ("Murphy") is, and was at all relevant times, Acacia's Corporate Controller and Principal Accounting Officer.  He signed or authorized the signing of the Registration Statement.

11.    Defendants Eric A. Swanson ("Swanson"), Peter Y. Chung ("Chung"), Benny P. Mikkelsen ("Mikkelsen"), Stan J. Reiss ("Reiss"), John Ritchie ("Ritchie") and Vincent T.

Roche ("Roche") were each members of Acacia's Board of Directors at the time of the Secondary Offering. They each signed or authorized the signing of the Registration Statement.

12.　　Defendants Shanmugaraj, Gavin, Murphy, Swanson, Chung, Mikkelsen, Reiss, Ritchie and Roche are collectively referred to herein as the "D&O Defendants."

13.　　Defendants Matrix Partners VIII, L.P. ("Matrix"), Summit Partners Venture Capital Fund III-A ("Summit III-A"), Summit Partners Venture Capital Fund III-B ("Summit III-B"), Summit Investors I, LLC ("Summit Investors"), Summit Investors I (UK), L.P. ("Summit UK" and collectively with Summit III-A, Summit III-B and Summit Investors, "Summit"), Commonwealth Capital Ventures IV L.P. ("Commonwealth"), The Malini Shanmugaraj 2016 QTIP Trust (the "Shanmugaraj Trust"), Mehrdad Givehchi ("Givehchi"), Givehchi LLC, John LoMedico ("LoMedico"), Bhupendra C. Shah ("Shah"), Bhupendra Shah 1999 Trust U/A DTD 10/06/1999 ("Shah Trust"), Christian Rasmussen ("Rassmussen"), OFS Fitel, LLC ("Fitel"), Egan Managed Capital III, L.P. ("Egan") and Weston & Co. VIII, LLC ("Weston") were each sellers of Acacia common stock in the Secondary Offering, as were Defendants Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss and Ritchie.

14.　　Defendants Matrix, Summit, Commonwealth, Shanmugaraj Trust, Givehchi, Givehchi LLC, LoMedico, Shah, Shah Trust, Rasmussen, Fitel, Egan, Weston, Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss and Ritchie are collectively referred to herein as the "Selling Defendants."

15.　　Defendants Goldman Sachs & Co. ("Goldman"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Needham & Company, LLC ("Needham"), Cowen and Company, LLC ("Cowen"), William Blair & Company, L.L.C. ("William Blair") and Northland Securities, Inc. ("Northland") all served as underwriters for the Secondary Offering and all did business

within this District in connection with the Secondary Offering. Collectively, Goldman, Merrill Lynch, Deutsche, Morgan Stanley, Needham, Cowen, William Blair and Northland are referred to herein as the "Underwriter Defendants."

16.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the Secondary Offering and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately, and free from misstatement or omission.

## BACKGROUND

17.     Defendant Acacia develops, manufactures and sells communication equipment. It sells high-speed coherent optical interconnect products in the Americas, Europe, the Middle East, Africa and the Asia Pacific region. The Company's product offerings include a series of low-power coherent digital signal processor application-specific integrated circuits, or DSP ASICs, and silicon photonic integrated circuits, or silicon PICs, which it has integrated into families of optical interconnect modules with transmission speeds ranging from 40 to 400 gigabits per second, or Gbps, for use in the long-haul, metro and inter-data center markets. Acacia derives substantially all of its revenue from the sale of its products within its 100 and 400 Gbps product families.

18.     Acacia sells the substantial majority of its products to network equipment manufacturers for ultimate sale to communications and content service providers and data center and cloud infrastructure operators. Its network equipment manufacturer customers are expected to be the primary market for its products for the foreseeable future.

19.     Acacia does not allow for product returns. Its customers typically consider the purchase of an Acacia product as a significant decision. According to Acacia, its "product

revenue is typically characterized by a life cycle that begins with sales of pre-production samples and prototypes followed by the sale of early production models with higher average selling prices and lower volumes, followed by broader market adoption, higher volumes, and average selling prices that are lower than initial levels."

20.     Acacia's products are supposed to be fully functional at the time of shipment and do not require production, modification or customization. According to the Company, it recognizes revenue from product sales only after persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collection is reasonably assured.

21.     These factors provided Acacia with insight into customer demand and its upcoming sales.

22.     On August 11, 2016, Acacia issued a press release announcing its financial results for the second quarter of 2016 ended June 30, 2016, and reporting net income of $17.6 million on revenue of $116.2 million compared to net income of $4.71 million on revenue of $57.85 million for the same period in the prior year, increases of 274% and 101%, respectively.  Acacia also provided guidance for the third quarter of 2016 ended September 30, 2016, which was well above what the market had been led to expect.  The press release stated, in part, as follows:

> "Our record second quarter results exceeded our expectations across the board and reflect the success of our disruptive technology in transforming cloud, content and communications networks. These results are a testament to our strategy and demonstrate our leadership position in the high-growth 100G plus optical networking market," said Raj Shanmugaraj, President and CEO of Acacia Communications, "We continue to see strong Acacia demand for our products, driven by metro and inter-data center network infrastructure buildouts."

23.     Later that afternoon, Acacia conducted a conference call with analysts and investors and provided further positive commentary about the Company's business metrics and financial prospects.

24.     Analysts reacted positively to the Company's statements and upbeat guidance.

For example, on August 12, 2016, Deutsche issued a report, which stated in part as follows:

> Solid Q2 beat and raise: $116.2M/77c versus consensus: $85.8M (consensus EPS numbers are not comparable), and the Q3 guide: $120-128M/64-76c versus consensus: $91.7M. The top-line beat was driven by strong Acacia demand for ACIA's [i.e., Acacia's] 100G and 400G Optical modules in Metro and Cloud Datacenter Interconnects. We are bullish on ACIA's "disruptive" Optical Networking Growth Story - a +$4-5B Silicon Optical opportunity [DB view]. Our mid-term view calls for +30% topline CAGR, high 40s gross margin, low 20s operating margin. We raise our PT from $60 to $90. Reiterate BUY.

25.     Similarly, on August 12, 2016, Cowen issued a report, which stated in part as follows:

> 2Q16 operating results bolster our investment outlook: ACIA represents an exceptional company addressing a significant 100G+ optical upgrade cycle (fueled by Metro, DCI and China), which should continue to drive impressive growth and operating profitability. We are significantly raising our operating forecasts and price target and reiterate our Outperform rating.

> *          *          *

> Strong growth in backlog, lead times of 9 - 10 weeks on the low end to as much as 13 – 15 weeks on the higher end, and some degree of supply constraint provides good visibility.

26.     On September 26, 2016, Acacia filed a Form 8-K with the SEC raising its third quarter of 2016 revenue guidance, and stating in part as follows:

> Based on preliminary unaudited information and estimates of the management of Acacia Communications, Inc. (the "Company") for the three months ending September 30, 2016, and subject to the completion of the 2016 third quarter and its financial closing procedures, in the three months ending September 30, 2016, the Company expects revenue of $127 million to $131 million, GAAP net income of $23 million to $27 million, non-GAAP net income of $29 million to $33 million, GAAP diluted earnings per share of $0.58 to $0.67 and non-GAAP diluted earnings per share of $0.72 to $0.81.

## SUBSTANTIVE ALLEGATIONS

27.      On September 26, 2016, Acacia filed a Form S-1 registration statement with the SEC, which stated that the Company intended to issue and sell approximately $125 million worth of its common stock and that certain selling stockholders would sell additional amounts of their personally held shares.

28.      On October 4, 2016, Acacia amended its Form S-1 registration statement, which was declared effective on October 6, 2016 by the SEC. On or about October 7, 2016, Acacia priced the Secondary Offering at $100 per share and filed its final prospectus (the "Prospectus"), which formed part of the registration statement (the "Registration Statement" and with the Prospectus, collectively, the "Offering Documents"), with the SEC. In the Secondary Offering, Acacia issued and sold 1,210,302 shares of common stock, receiving more than $121 million in gross proceeds, and the Selling Defendants sold another approximately 3,289,698 of their personally held shares, receiving approximately $328.9 million in gross proceeds.

29.      The Offering Documents emphasized the purported ongoing strong demand for Acacia's products, stating in part that Acacia had "experienced rapid revenue growth over the last several years," noting that its "revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014," and that its "revenue for the six months ended June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015." For the quarter ended September 30, 2016, the Offering Documents highlighted that Acacia expected "revenue of $130 million to $133 million," an increase of more than 100% over the $65.4 million reported in the third quarter of 2015.

30.      The Offering Documents further stated that Acacia's "revenue ha[d] generally increased . . . due to increased demand for products in [its] 100 Gbps product family, as well as the introduction of new products in [its] 400 Gbps product family."  The Offering Documents

also emphasized that one of Acacia's "Competitive Strengths" was "[c]ustomer collaboration provid[ing a] deep understanding of market needs." Acacia was stated to "collaborate closely with [its] customers, as well as directly with many cloud and service providers, which allows [it] to better understand their needs and anticipate next generation product and service requirements."

31.    The Offering Documents also stated that as Acacia "continue[d] to enhance and expand [its] product families, and as [its] existing customers [sought] to expand and improve their network equipment technology, [Acacia] expect[ed] to generate additional revenue through sales to these customers." The Offering Documents further stated that Acacia products and existing customers "will drive more network equipment manufacturers to purchase their optical interconnect products from [Acacia]."

32.    Concerning the quality of Acacia's products, the Offering Documents stated in part that, "[Acacia's] modules perform a majority of the digital signal processing and optical functions in optical interconnects and offer low power consumption, high density and high speeds at attractive price points." In addition, "[t]hrough the use of standard interfaces, [Acacia's] modules can be easily integrated with customers' network equipment" and that the "advanced software in [its] modules enables increased configurability and automation, provides insight into network and connection point characteristics and helps identify network performance problems, all of which increase flexibility and reduce operating costs."

33.    Specifically addressing the design and manufacturing of Acacia's products, the Offering Documents stated in part as follows:

> Our modules are rooted in our low-power coherent DSP ASICs and/or silicon PICs, which we have specifically developed for our target markets. Our coherent DSP ASICs are manufactured using complementary metal oxide semiconductor, or CMOS, and our silicon PICs are manufactured using a CMOS-compatible process. CMOS is a widely-used and cost-effective semiconductor

process technology. Using CMOS to siliconize optical interconnect technology enables us to continue to integrate increasing functionality into our products, benefit from higher yields and reliability associated with CMOS and capitalize on regular improvements in CMOS performance, density and cost. Our use of CMOS also enables us to use outsourced foundry services rather than requiring custom fabrication to manufacture our products. In addition, our use of CMOS and CMOS compatible processes enables us to take advantage of the major investments in manufacturing and the technology and integration improvements driven by other computer and communications markets that rely on CMOS.

Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This broad expertise in a range of advanced technologies, methodologies and processes enhances our innovation, design and development capabilities and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. . . . In the course of our product development cycles, we continuously engage with our customers as they design their current and next-generation network equipment, which provides us with insights into current and future market needs.

34.     The Offering Documents further stated that Acacia "intend[ed] to continue to invest in [its] technology to deliver innovative and high-performance DSP ASICs, silicon PICs and optical interconnect modules and to identify and solve challenging optical interconnect needs."  In addition, the Offering Documents represented that one of Acacia's "Competitive Strengths" was its track record of rapid innovation, stating that Acacia's "development capabilities and advanced design methodologies have enabled [it] to introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009."  Moreover, Acacia "believe[d] that growth in fiber optics-based communications [was] likely to accelerate and that this growth, together with expansion in other markets that depend on high-speed networking capabilities, such as intra-data center and network access markets, will result in demand for additional applications for our products."

35.     Regarding manufacturing, the Offering Documents stated as follows:

We contract with third parties to manufacture, assemble and test our products. We utilize a range of CMOS and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products. For several of our products, a single foundry fab is selected for semiconductor wafer production.

We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules. Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. We build the test systems used by our contract manufacturers. We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.

We subject our third-party manufacturing contractors and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.

36.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

37.     The above statements from the Offering Documents were false and misleading because they failed to disclose that the Company's manufacturing and quality control processes were deficient, which would disrupt Acacia's manufacturing and impact its revenues. In addition, the Offering Documents did not disclose that the Company was experiencing declining

demand for its products from its most important customers, which would also impact its revenues.

38.    The Offering Documents were materially false and misleading because they failed to disclose the following adverse facts:

(a)    Acacia's top two customers, which were collectively responsible for 62% of its sales, had experienced operational and sales problems in the period ended September 30, 2016, well before the Secondary Offering, which problems were limiting their demand for Acacia products at the time of the Secondary Offering;

(b)    a significant portion of the Company's pre-Secondary Offering sales growth was attributable to the 4G infrastructure buildout in China that was virtually complete, which was already reducing demand for product in that important market;

(c)    one of the Company's largest customers in Germany was having difficulty rolling out its own cloud-based technology using Acacia's products, reducing that customer's demand for Acacia's products; and

(d)    due to a circuit board cleaning process, there were "quality issue[s]" "affect[ing] a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers."

39.    In addition, pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. Under the rules and regulations governing the preparation of the Offering Documents, Acacia was required to disclose at the time of the Secondary Offering that sales to its top two customers were declining due to operational issues specific to those companies and that there were quality issues with the

manufacture of the product offerings of Acacia's largest customer, Hong-Kong based ZTE Kangxun Telecom Co. Ltd. ("ZTE"), which the Company would be responsible for remediating. The Offering Documents, however, contained no such disclosures. These adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Acacia's profitability, and, therefore, were required to be disclosed in the Offering Documents but they were not.

### The Truth Begins to be Disclosed to the Market

40.    On October 27, 2016, Acacia's largest customer, ZTE, which had provided approximately 38% of Acacia's sales during the first half of 2016, reported dismal third quarter of 2016 sales and even worse sales guidance for fiscal year 2016.  ZTE's third quarter ended on September 30, 2016, prior to the Secondary Offering.  ZTE issued weak forward sales guidance as demand for ZTE's 4G telecom infrastructure was slowing in China as major carriers completed their network coverage. That same day, Germany's ADVA, Acacia's second largest customer, historically responsible for 24% of its sales, also issued soft earnings guidance for fiscal year 2016, stating that it had fallen approximately three months behind in rolling out its CloudConnect technology, which used Acacia's 400 gigabit coherent module.

41.    On this news, the price of Acacia common stock declined approximately 14% on October 27, 2016, closing at $73.66 per share, on unusually high volume of more than 8.5 million shares traded, or more than four times the average daily trading volume over the preceding ten trading days.

42.    On February 23, 2017, Acacia issued revenue guidance for fiscal year 2017, which was well below what Acacia had led the investment community to expect. As a prime cause for the disappointing guidance, Acacia cited weak orders from one big unnamed customer, identified by several stock analysts as ADVA.  In an article by *The Motley Fool*, it was stated

that Acacia was still highly dependent upon a few customers and its "days of extremely rapid growth" provided by those customers "appear[ed] over for now."

43.     On this news, the price of Acacia common stock declined more than 14% on February 24, 2017, closing at $54.04 per share, on unusually high volume of more than 5.1 million shares traded, or more than twice the average daily trading volume over the preceding ten trading days.

44.     On May 8, 2017, a stock analyst at William Blair cut that firm's estimates on Acacia, citing "first-quarter earnings commentary from a number of optical vendors," including Macom Technology Solutions Holdings, Inc. and others, each of which had provided underwhelming projections for the June 2017 quarter, citing "near-term demand slowdown in China and inventory correction issues." The "weakness in most cases was attributed to Huawei," but it was noted that business at ZTE had also been affected.  The analyst pointed out that "Acacia derived 41% of revenue from China in 2016 and ZTE represented 32% of total revenue."

45.     On this news, the price of Acacia common stock declined further from a price of $47.52 per share on May 5, 2017 to a closing price of $46.85 per share on May 8, 2017, the next trading day.

46.     On May 9, 2017, Acacia issued a press release announcing its financial results for the first quarter ended March 31, 2017, and provided lower second quarter of 2017 guidance than the market had expected.  Acacia expected second quarter of 2017 earnings per share ("EPS") of $0.22-$0.35 per share on revenues of $85-$95 million, considerably lower than the EPS of $0.74 per share on revenues of $131 million that the market had been led to expect based on Acacia's prior statements. Acacia attributed the reduced guidance primarily to a slowdown in demand from China.

47.     On this news, the price of Acacia common stock declined more than 8% on May 10, 2017, closing at $44.48 per share, on unusually high volume of more than 2 million shares traded.

48.     On May 31, 2017, Acacia disclosed that it had identified a quality issue with certain of its previously shipped AC400 and CFP units and that it was working with its customers to remediate the problems with those units, to determine the costs of that remediation and to evaluate the impact on Acacia's ongoing manufacturing capacity.

49.     On July 14, 2017, before the market opened, Acacia issued a press release announcing its preliminary financial results for the second quarter ended June 30, 2017 and reducing its guidance for the third quarter ending September 30, 2017, with defendant Shanmugaraj stating in part: "Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31."  Shanmugaraj further stated, in part, that, "[a]s . . . previously announced, [Acacia had] identified a circuit board cleaning process [that was] the likely root cause of the quality issue," and "[a]lthough [Acacia] began to ramp manufacturing capacity with [its] contract manufacturers during the quarter, [it] experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for [its] AC400 and CFP units," and that it "anticipate[d] completing . . . remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

50.     In the July 14, 2017 press release, Acacia reported second quarter EPS of $0.17-$0.20 on revenues of $77-$79 million, far lower than the EPS of $0.31 on $91 million in revenues the market had been led to expect.  For the third quarter of 2017, Acacia stated that it now anticipated reporting EPS of $0.25 to $0.40 on revenues of $95-$110 million, well below the EPS of $0.47 per share on $108 million in revenues the market had been led to expect.

51.     On this news, the price of Acacia common stock declined from its close of $41.62 per share on July 13, 2017 to close at $39 per share on July 14, 2017, on unusually high volume of more than 3.5 million shares traded.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased Acacia common stock pursuant to or traceable to the Secondary Offering and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Acacia sold more than 4.5 million shares of common stock in the Secondary Offering. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Acacia or its transfer agent or the underwriters to the Secondary Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

54.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' claims arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

55.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class  are:

(a)     whether the 1933 Act was violated by Defendants' acts as alleged herein;

(b)     whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the Secondary Offering negligently omitted and/or misrepresented material facts about Acacia and its business; and

(c)     the extent of damages sustained by members of the Class and the appropriate measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  In addition, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress individually for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 11 of the Securities Act
### Against Acacia, the D&O Defendants,
### and the Underwriter Defendants

57.     Plaintiff repeats and realleges each and every allegation contained above.

58.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Plaintiff and the other members of the Class, against all Defendants.  This Count is not alleging fraud or intentional conduct or recklessness.

59.     Plaintiff and the other members of the Class acquired common stock of Acacia pursuant to or traceable to the Offering Documents.

60.     The Registration Statement and the Prospectus incorporated therein were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

61.     Specifically, and as set forth above in more detail, the Offering Documents portrayed Acacia as a rapidly growing company, when in fact, demand from its top two customers was declining and it was experiencing quality issues that would disrupt its sales cycle.

62.     As issuer of the common stock, Acacia is strictly liable to Plaintiff and the Class for the misstatements and omissions.

63.     The D&O Defendants each signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

64.     The Underwriter Defendants each served as underwriters in connection with the Secondary Offering.  Thus, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

65.    In connection with the offering and sale of Acacia common stock, Defendants used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

66.    Neither the D&O Defendants nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts necessary to make such statements not misleading.

67.    At the time they acquired their shares of Acacia common stock, Plaintiff and the Class were without knowledge of the material misstatements and omissions set forth above.

68.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

69.    By virtue of these violations, Plaintiff and the other members of the Class have sustained damages.  The value of the common stock of Acacia has declined substantially subsequent to the Secondary Offering and due to Defendants' violations.

70.    Less than one year has elapsed from the time that Plaintiff discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

71.    Plaintiff repeats and realleges each and every allegation set forth above.

72.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class. This Count is not alleging fraud or intentional conduct or recklessness.

73.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Offering Documents.  Specifically, Defendants were statutory sellers, as alleged above, who sold and/or solicited the sale of the common stock to the Class by means of the Offering Documents and/or the marketing activities associated with the Secondary Offering.  They did so for the benefit of Acacia and/or for their personal gain. Plaintiff and the other members of the Class purchased or otherwise acquired shares of Acacia common stock in the Secondary Offering pursuant to the Offering Documents.

74.     As set forth above, the Offering Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the inaccurate and misleading Offering Documents and participating in efforts to market the Secondary Offering to investors.

75.     Defendants owed to the purchasers of Acacia common stock, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Offering Documents and related documents contained misstatements and omissions of material fact. Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts necessary to make such statements not misleading.

76.     Plaintiff and the other members of the Class purchased or otherwise acquired Acacia Common Stock pursuant to the Offering Documents, and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Offering Documents.

77.     By reasons of the conduct herein alleged, each Defendant violated Section 12(a)(2) of the Securities Act.

78.     By virtue of these violations, Plaintiff and the other members of the Class have sustained damages.  Accordingly, Plaintiff and the other members of the Class who purchased or otherwise acquired Acacia common stock pursuant to the Offering Documents have a right to rescind and receive their consideration paid, and hereby elect to rescind and tender their stock to Acacia and the other Defendants.  Members of the Class who have sold their Acacia common stock issued in the Secondary Offering are entitled to compensatory damages.

79.     Less than one year has elapsed from the time that Plaintiff discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

### COUNT II
### Violations of Section 15 of the Securities Act
### Against the D&O Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above.

81.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the D&O Defendants on behalf of Plaintiffs and the other members of the Class. This Count is not alleging fraud or intentional conduct or recklessness.

82.     Each of the D&O Defendants was a control person of Acacia by virtue of their position as a director and/or senior officer of Acacia.  The D&O Defendants participated in the operation and management of Acacia, and conducted and participated in Acacia's business affairs.  Further, by reason their ability to make public statements in the name of Acacia, the D&O Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Acacia to engage in the conduct complained of herein, including disseminating the Offering Documents, which were materially false and misleading.

83.     Each of the D&O Defendants were culpable participants in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the

Secondary Offering to be successfully completed. By reason of the foregoing, the D&O Defendants are liable under Section 15 of the Securities Act to the same extent that Acacia is liable under Sections 11 and 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased Acacia common stock pursuant to or traceable to the Secondary Offering pursuant to the Offering Documents. By reason of such wrongful conduct, Plaintiff and the Class suffered damages for which these Defendants are liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representative and Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the other members of the Class rescission or compensatory damages on their §12(a)(2) claims;

D.    Awarding Plaintiff and the other members of the Class interest and their costs and expenses, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.    Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated:  October 13, 2017                    By her attorneys,

                                            **/s/Adam M Stewart_____**
                                            Edward F. Haber (BBO#215620)
                                            ehaber@shulaw.com
                                            Adam M. Stewart (BBO#661090)
                                            astewart@shulaw.com
                                            **SHAPIRO HABER & URMY LLP**
                                            Seaport East
                                            Two Seaport Lane
                                            Boston, MA  02210
                                            (617) 439-3939

                                            **Plaintiff's Proposed Liaison Counsel**


                                            ABRAHAM, FRUCHTER & TWERSKY, LLP
                                            Jack G. Fruchter
                                            jfruchter@aftlaw.com
                                            Lawrence D. Levit
                                            llevit@aftlaw.com
                                            One Penn Plaza, Suite 2805
                                            New York, NY 10119
                                            Tel:  (212) 279-5050
                                            Fax: (212) 279-3655

                                            **Plaintiff's Proposed Lead Counsel**

## CERTIFICATION OF RINA ROLLHAUS
## IN SUPPORT OF CLASS ACTION COMPLAINT

Rina Rollhaus ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint filed by counsel in the above-captioned case and has authorized the filing of a similar complaint or to otherwise file a motion to be named as lead plaintiff in these proceedings.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff=s counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff purchased 150 shares of Acacia Communications Inc. common stock at the price of $100.00 per share pursuant to and traceable to the Secondary Offering on October 7, 2016.

5.    In the past three years, plaintiff has not served nor sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff=s pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of September, 2017.

Rina Rollhaus